**CYRIX CORPORATION, Plaintiff,**

**Texas Instruments Inc., SGS–Thomson Microelectronics, Inc., and International Business Machines, Corporation, Intervenors,**

**v.**

**INTEL CORPORATION, Defendant.**

**No. 4:92cv52.**

United States District Court,
E.D. Texas,
Sherman Division.

Jan. 3, 1995.

Order Denying Reconsideration
Feb. 27, 1995.

George Allan Van Fleet, Erica L. Krennerich, Vinson & Elkins, Houston, TX, Albert E. Fey, Laurence S. Rogers, Kelsey I. Nix, Elaine A. Drager, Fish & Neave, New York City, Joseph Wilbur Wolfe, Wolfe Clark & Henderson, Sherman, TX, Richard Allan Sayles, Steven E. Aldous, Sayles & Lidji, Dallas, TX, for Cyrix Corp.

Frank Finn, Thompson & Knight, Dallas, TX, for SGS–Thomson Microelectronics Inc.

Ernest Ryan Higginbotham, Strasburger & Price, Dallas, TX, Evan R. Chesler, Rich-

ard W. Clary, Robert H. Baron, Philip C. Koroglogos, Suja A. Thomas, Cravath Swaine & Moore, New York City, Donald J. Rosenberg, John C. Scheffel, III, White Plains, NY, for International Business Machines Corp.

Danny Lloyd Williams, Wayne Manford Harding, James Joseph Elacqua, Henry A. Petri, Jr., Thomas A. Miller, Arnold White & Durkee, Houston, TX, Carl Silverman, Intel Corp., Santa Clara, CA, Patricia A. Hubbard, Alan H. Blankenheimer, Daniel P. Quigley, Jonathan M. James, Chad S. Campbell, Steven R. Rodgers, Paul F. Eckstein, Brown & Bain, Phoenix, AZ, Stephen H. Cagle, Arnold White & Durkee, Houston, TX, Clyde Moody Siebman, Siebman & Reynolds, Sherman, TX, Joseph Kattan, Morgan, Lewis & Bockius, Washington, DC, for Intel Corp.

## MEMORANDUM OPINION AND ORDER

PAUL N. BROWN, District Judge.

Pending before the Court are Intel Corporation's Motion for Summary Judgment that Cyrix Microprocessors Made by Affiliates of SGS–Thomson Microelectronics, Inc. are Not Licensed by Intel and SGS–Thomson Microelectronics, Inc.'s Motion for Summary Judgment and Supplemental Motion for Summary Judgment. The Court having considered the motions, the responses, the briefs and arguments of the parties and all of the summary judgment evidence, is of the opinion, for the reasons stated below, that Intel's motion should be denied and intervenor SGS–Thomson Microelectronics, Inc.'s supplemental motion should be granted.

### BACKGROUND

In 1977, Intel Corporation ("Intel") and Mostek Corporation ("Mostek") entered into a Cross License Agreement ("the License Agreement"), the terms of which provided that each party granted to the other a license "to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of licensed products." The original term of the License Agreement was ten years, but the Agreement was extended to 22 years pursuant to an amendment in November 1982.

This License Agreement has been assigned to SGS–Thomson Microelectronics, Inc. ("ST") and is a valid and binding agreement between ST and Intel.

This Court has previously determined that the License Agreement is not ambiguous and is to be governed and interpreted by the law of Delaware.

ST is now having SGS–Thomson Microelectronics S.r.L., Agrate, Italy ("ST–Italy") manufacture for Cyrix Corporation ("Cyrix") microprocessor wafers ("wafers"). ST claims that this arrangement with ST–Italy for the manufacture of these wafers is a valid exercise of its have-made rights under the License Agreement. Intel contends that ST has exceeded its have-made rights. Intel claims that the prohibition against sublicensing contained in the License Agreement, in addition to the inherent nonexclusive nature of the license, acts to limit ST's "have-made" rights. Intel argues that the transactions between ST and Cyrix and ST and ST–Italy for the manufacture of these wafers are merely a facade; that in effect Cyrix is buying the wafers directly from ST–Italy; and that ST–Italy is not producing the wafers for ST, the original licensee, but for its own use.

Both Intel and ST have submitted a statement of undisputed facts in support of their respective motions, and from these statements and the responses to the statements, it is evident that the parties are in substantial agreement on the material facts. However, Intel contends that ST's undisputed facts are, in reality, erroneous conclusions that are contrary to controlling legal principles, and in opposition to Intel's statement, ST contends that Intel's undisputed facts are immaterial and irrelevant because the Court is only confronted with a purely legal issue of contract interpretation. ST also argues that some of Intel's alleged undisputed facts are inaccurate.

### SUMMARY JUDGMENT STANDARD

The granting of summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The trial court must resolve all reasonable doubts in favor of the

party opposing the motion. *Casey Enterprises, Inc. v. Am. Hardware Mut. Ins. Co.,* 655 F.2d 598, 602 (5th Cir.1981) (citations omitted). The party seeking summary judgment carries the burden of demonstrating that there is no actual dispute as to any material fact in the case. This burden, however, does not require the moving party to produce evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party satisfies its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.*

■ Once the moving party has satisfied its burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). If the nonmovant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof, then summary judgment will be appropriate. *Celotex,* 477 U.S. at 321–24, 106 S.Ct. at 2552–53. Even if the nonmovant brings forth evidence in support of its allegations, summary judgment will be appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).

## DISCUSSION

■ Intel contends ST has assumed the position of a broker and the transaction paperwork for the manufacture of the wafers is passed through ST solely in order to bypass the prohibition against sublicensing contained in the License Agreement. Intel argues the manufacturing arrangement between ST and ST–Italy is prohibited under the controlling Delaware law as expounded by the Delaware Supreme Court in *E.I. du Pont de Nemours and Co. v. Shell Oil Co.,* 498 A.2d 1108 (Del.1985).

In analyzing the claims of Intel, the Court must answer two questions: first, for whom are the wafers actually made, and second, by whom are they actually sold? The Court is able to answer both of these questions from facts that are undisputed in the summary judgment evidence. The following facts are undisputed:

1. In late 1992 ST began manufacturing wafers for Cyrix at its Carrollton, Texas, facility. The manufacture and sale of these wafers by ST to Cyrix was permitted under the License Agreement.

2. In mid–1993, ST–Italy, an affiliate of ST, began manufacturing some of the wafers for ST due to a temporary limitation in the capacity of ST to manufacture enough wafers in Carrollton, Texas, to meet its contractual obligations to Cyrix. It is disputed whether this limitation in capacity was created by an actual lack of manufacturing capacity or because of a reallocation of products manufactured at the Carrollton facility. At that time ST provided the process technology, database tapes, and technical assistance necessary to enable ST–Italy to manufacture the wafers for ST.

3. All products manufactured by ST–Italy were first prototyped at ST, and all production commitments were made by ST. ST further authorized Cyrix and ST–Italy to communicate with one another on technical issues and production scheduling. Wafers made for ST by ST–Italy are also made by ST in Carrollton, Texas.

4. Once wafers were manufactured by ST–Italy, they were shipped to ST's warehouse in Phoenix, Arizona, or to Carrollton, Texas. No ST affiliate has ever shipped wafers to Cyrix. The shipping operation is performed exclusively by ST.

5. ST–Italy invoices ST for all wafers manufactured in Italy and ST–Italy does not invoice Cyrix for any wafers.

6. ST invoices Cyrix for all wafers out of ST's shipping and receiving departments.

7. The terms and conditions of sale for all wafers sold by ST to Cyrix, including price, warranty and risk of loss, are negotiated between ST and Cyrix, and are the same

regardless of whether ST or ST–Italy manufactures the wafers.

Intel argues that the transactions between Cyrix and ST and ST and ST–Italy are a mere "paper shuffle" without substance, and in support of this argument submits the following conclusions drawn from statements from depositions and other discovery conducted by Intel in this case:

1. Cyrix characterizes ST–Italy as Cyrix's own "Subcontractor" and ST as a "Broker".

2. The paper transactions effectuating the arrangement among Cyrix, ST, and ST–Italy are merely a facade.

3. Nonconforming microprocessors are returned by Cyrix to ST–Italy.

4. Cyrix is intimately involved in process engineering for its wafers in ST–Italy's Facility.

5. ST does not handle packages with Cyrix wafers as they are shipped by ST–Italy and forwarded by a Dallas customs broker to Cyrix.

The summary judgment evidence does not support some of the conclusions made by Intel and others are not relevant. Cyrix has no authority to direct the manufacturing activities of ST–Italy and does not. It does attempt to monitor the manufacturing process at ST–Italy in order to protect the quality of the wafers manufactured and help solve problems that may arise in the manufacturing process. All of the purchase orders for the wafers from ST–Italy are generated by ST and not by Cyrix. Cyrix does not require or request that particular wafers be manufactured by ST–Italy. As a matter of fact, the summary judgment evidence would indicate that Cyrix would prefer that all of their wafers be manufactured by ST at its Carrollton, Texas, facility. Nonconforming microprocessors were not, in fact, returned by Cyrix to ST–Italy, but were returned to ST in Carrollton. Intel's statement that ST does not handle packages with Cyrix microprocessors as they are shipped by ST–Italy and forwarded by a Dallas customs agent to Cyrix may be technically correct. However, the summary judgment evidence establishes that title to the wafers passes to ST and ST takes delivery of the wafers before it ships them to Cyrix. The wafers are not shipped directly to Cyrix by ST–Italy. The customs agent is hired by ST, reports to ST, receives instructions and authorizations only from ST, and holds ST's power of attorney for purposes of moving the wafers thorough U.S. Customs and on to Cyrix.

Intel contends that the manufacturing arrangement between ST and ST–Italy is almost exactly like the manufacturing arrangement considered by the Delaware Supreme Court in *E.I. du Pont ibid.* and found to be in violation of the patent licensing agreement between Shell Oil Company and E.I. du Pont. The facts and sequence of events in the *du Pont* case were as follows:

In 1968 Shell Oil Company ("Shell") obtained a nonexclusive license from E.I. du Pont de Nemours and Company ("du Pont") to make, have made, use and sell, for use and resale methomyl. In the 1970's Union Carbide Agricultural Corporation, Inc. ("Carbide") developed a product called Larven, an insecticide which used methomyl in its formulation. Carbide sought a ready supply of methomyl to use in the formulation of Larven. Carbide first requested a license from Shell to manufacture methomyl. Shell informed Carbide that it did not have the right to sublicense the manufacture of methomyl and that only du Pont could grant a license for the domestic manufacture of methomyl. As an alternative, Carbide investigated the possibility of buying from Shell quantities of methomyl sufficient to fill its needs, but learned that the Shell plant from which Carbide desired to obtain its supply did not have sufficient capacity to fill its needs. Shell then proposed to Carbide that Carbide would manufacture methomyl for Shell under the have-made provision of its license agreement with du Pont and Shell would then immediately sell the methomyl back to Carbide, using a separate purchase and sale agreement. Carbide initially rejected this proposal. Carbide then approached du Pont directly to obtain a license to manufacture methomyl. Carbide proposed that du Pont license Carbide for its use of methomyl in Larven, and in return Carbide would grant du Pont a license to sell Larven. Du Pont rejected this

proposal, but offered to sell Carbide methomyl at a favorable price. Carbide rejected this counter offer and then immediately re-contacted Shell. Shell and Carbide then entered into a methomyl toll conversion agreement and a methomyl purchase and sale agreement. These agreements were negotiated, drafted and executed simultaneously. Both agreements covered the same period of time, terminating in 1988 when du Pont's methomyl patent expired. Under these agreements, Carbide was to construct a plant to manufacture 18,000,000 pounds of methomyl per year. In essence, the agreements provided that Carbide would produce methomyl for Shell's account, simultaneously buying back from Shell some or all of the methomyl Carbide manufactured. Under the agreements, Carbide would order from Shell the amount of methomyl it required, and Shell would convey such information back to Carbide so it could manufacture the required amount. Carbide would manufacture the methomyl and would place the methomyl in its own containers, which simultaneously effected both the delivery to Shell and redelivery to Carbide. Shell was obligated to sell to Carbide all of the methomyl which Carbide required, but was not obligated to sell unless Carbide performed its obligations under the toll conversion agreement.

The evidence in the *du Pont* case showed that the drafters of the agreements were concerned about the prohibition against sublicensing and drafted the agreements specifically to circumvent this provision. The Delaware Supreme Court concluded that Shell had, in effect, granted Carbide a sublicense which was prohibited by its licensing agreement with du Pont. The Court reasoned that the prohibition against the sublicensing of the patented product restricted the have-made rights of Shell so as not to permit the arrangement with Carbide. The Court concluded that "What Carbide bargained for was to pay Shell for use of its license rights under the du Pont patent" and that ultimately Carbide was producing methomyl not for Shell, but rather for itself.

The *du Pont* case required the Court to determine the limits of a licensee's right to manufacture, have made and sell a product

under a grant of a nonexclusive license without a right to sublicense. This Court is required to make the same determination, however, the facts on which the *du Pont* court made its determination were far different from the facts in this case.

The *du Pont* case involved du Pont, who had granted a license to Shell to make and to have made licensed products, and a third party, Carbide, who was not licensed but was manufacturing a licensed product under an agreement with Shell. This case involves Intel, who has granted a license to ST to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of licensed products, ST–Italy, who is not licensed and is manufacturing licensed products, and Cyrix, who purchases the products from ST.

When the substance of the transactions between Shell and Carbide and the substance of the transactions between ST, ST–Italy and Cyrix are compared, the following important differences are noted:

1. The arrangement between Shell and Carbide resulted from the failed efforts of Carbide to obtain a sublicense agreement from du Pont. The arrangement between ST and ST–Italy resulted from ST's need to have wafers manufactured by a third party in order to meet the needs of its customer Cyrix.

2. The two agreements between Shell and Carbide, one being a purchase-sale agreement and the other being a toll conversion agreement, were entered into simultaneously. ST and Cyrix had entered into an agreement for the manufacture by ST of wafers for Cyrix at a substantially earlier date than the date ST began having ST–Italy manufacture wafers.

3. The evidence showed that the Shell/Carbide agreements were drafted specifically in an effort to avoid the prohibition against sublicensing. There is no evidence that the agreement between ST and ST–Italy for the manufacture of wafers was entered into for any reason other than to meet the needs of ST's customer Cyrix.

4. ST–Italy manufactures wafers only when ordered by ST to meet the needs of

ST's customer Cyrix. Carbide manufactured methomyl for itself at any time it had a need for methomyl for its own operations.

5. The performance by Shell of its obligations under the purchase and sale agreement were conditioned upon Carbide's performance of its obligations under the methomyl toll conversion agreement. ST's obligations to Cyrix are not conditioned upon the performance by ST–Italy of its obligations to ST.

6. Carbide initiated the transactions for the sale and manufacture of methomyl. ST–Italy does not initiate the transactions for the manufacture of the wafers.

7. After Carbide manufactured methomyl, the methomyl never actually left Carbide's possession, but only a paper delivery was effected to Shell and then a paper redelivery to Carbide. After ST–Italy manufactures the wafers, they are delivered to ST and then ST delivers the wafers to Cyrix.

8. The agreements between Shell and Carbide were for a long term, continuing until du Pont's patent expired. Under the ST/ST–Italy arrangement, the wafers are manufactured pursuant to a series of purchase orders issued by Cyrix and ST and there is no long-term obligation on the part of any party. Under the Shell/Carbide arrangement, methomyl was manufactured by Carbide to meet its own needs in its own plant. Under the ST/ST–Italy arrangement, Cyrix places an order with ST for a certain quantity of wafers. ST may then manufacture such wafers in its own facility at Carrollton, Texas, or issue a purchase order to ST–Italy for the manufacture of the wafers. If the wafers are manufactured by ST–Italy, title to the wafers is delivered to ST in Italy and thereafter ST assumes all market risk with respect to the wafers.

Intel argues that the wafers are not licensed products because ST has not used the wafers and, therefore, they cannot be licensed unless they are made or sold by ST. Intel claims that ST merely shuffles paperwork and that the wafers were in fact made and sold by ST–Italy, an unlicensed third-party foundry. The summary judgment evidence does not support this argument, nor does it create a material issue of fact for trial with respect to who makes and sells the wafers. The substance of the arrangement between Cyrix and ST and ST and ST–Italy is that when Cyrix needs wafers, it issues a purchase order to ST. ST then either manufactures the wafers itself at its Carrollton, Texas, facility or arranges for ST–Italy to manufacture the wafers at its Italian facility. ST is selling wafers. It is not selling or receiving payment for the use of its license from Intel. It has not authorized ST–Italy to make the wafers for or sell them to anyone other than ST. The production of the wafers is for the use of ST, the original licensee, and not for the use of ST–Italy. This is a valid exercise of the have-made rights granted under the License Agreement and does not constitute a sublicense.

Intel seems to take the position that any exercise by ST of its have-made rights by having a third party manufacture a licensed product which it in turn sells to its customer is impermissible because of the prohibition against sublicensing. The Court disagrees. A prohibition against sublicensing does not invalidate have-made rights granted elsewhere in a licensing agreement. *Carey v. United States*, 326 F.2d 975, 164 Ct.Cl. 304 (1964); *Southwire Co. v. U.S. Int'l Trade Com'n*, 629 F.2d 1332 (C.C.P.A.1980).

## CONCLUSION

ST–Italy is actually manufacturing the wafers for ST and the wafers prior to their manufacture have actually been sold by ST to Cyrix. ST has not attempted to grant ST–Italy a sublicense. It is exercising its have-made rights. Intel's Motion for Summary Judgment should, therefore, be denied and ST's Supplemental Motion for Summary Judgment should be granted.

Cyrix should submit to the Court a proposed form of judgment in this case on or before 20 days from the date of the signing of this Order.

IT IS SO ORDERED.

### *ORDER DENYING INTEL'S MOTION FOR RECONSIDERATION*

Pending before the Court is Intel Corporation's Motion for Reconsideration of this Court's Memorandum Opinion and Order of January 3, 1995, granting Intervenor SGS–Thomson Microelectronics, Inc.'s Supplemen-

tal Motion for Summary Judgment. The Court has carefully considered Intel's motion and the responses of the parties.

The Court has not considered the new documents submitted by Intel in support of its Motion for Reconsideration. These documents were in the possession of Intel for a considerable period of time prior to the filing of its motion for summary judgment and were not offered in support of its motions or in opposition to ST's motion for summary judgment. Intel has not shown to the Court any reason why it could not have submitted these documents for the Court's consideration at the time the Court ruled on the motions for summary judgment.

The Court remains persuaded that there are no material fact issues for trial and that the granting of Intervenor SGS–Thompson Microelectronics, Inc.'s Supplemental Motion for Summary Judgment was proper. In its motion Intel argues that the Court's ruling "... inflicts a grave and unintended injustice on patentee-licensors like Intel because it allows nonexclusive licensees like ST to 'farm out' the ability to manufacture the patented product under license from Intel to an infinite number of foundries working on behalf of an infinite number of third parties. This result completely eviscerates any value in the licensed patent to the patentee-licensor, completely eviscerates any ability of the licensor to further license the patent, and is contrary to the very purpose of a nonexclusive license which grants have-made rights to a single party such as ST." This argument fails because of the extremely broad rights that were granted in the cross license agreement. Intel essentially received the same rights in the Mostek patents as Mostek received in the Intel patents. The cross license agreement contains few limitations, and the Court has concluded that the license agreement permits ST to have the microprocessors made by ST–Italy. Intel could have prevented this result by placing limitations in the cross license agreement. The Motion for Reconsideration should, therefore, be denied.

IT IS SO ORDERED.