**SUPERSPEED, L.L.C., Plaintiff,**

v.

**GOOGLE, INC., Defendant.**

**Civil Action No. H–12–1688.**

United States District Court, S.D. Texas, Houston Division.

Signed Feb. 25, 2014.

Adam Carlis, Max Lalon Tribble, Jr., Neal S. Manne, Susman Godfrey LLP, Houston, TX, Edgar G. Sargent, Susman Godfrey LLP, Seattle, WA, Kathryn P. Hoek, Susman Godfrey LLP, Los Angeles, CA, Daniel J. Krueger, Krueger Iselin LLP, Cypress, TX, for Plaintiff.

Darcy L. Jones, Jeffrey J. Toney, Jonathan K. Waldrop, Kasowitz, Benson, Torres & Friedman, LLP, Atlanta, GA, David J. Beck, Robert Henry Ford, Beck Redden LLP, Michael E. Richardson, II, Beck Redden et al, Houston, TX, Parker C. Ankrum, Rebecca L. Unruh, Kasowitz Benson Torres et al., Redwood Shores, CA, for Defendant.

## MEMORANDUM OPINION AND ORDER

SIM LAKE, District Judge.

This is a patent infringement suit filed by SuperSpeed, L.L.C. ("SuperSpeed") against Google, Inc. ("Google"), involving United States Patent Nos. 5,577,226 ("'226 patent") and 5,918,244 ("'244 patent"). The '226 patent is the parent application to the '244 patent, and both patents claim priority to U.S. Application No. 08/238,815, filed on May 6, 1994. Pending before the court is Defendant Google Inc.'s Motion for Summary Judgment of Non–Infringement Based on Its Licensing Defense (Docket Entry No. 105), and SuperSpeed's Cross–Motion for Summary Judgment on Google's Licensing Defense (Docket Entry No. 114). For the reasons explained below, Google's motion for summary judgment will be denied and SuperSpeed's cross-motion for summary judgment will be granted.

## I. Background

SuperSpeed alleges that Google infringes the '226 and the '244 patents. Both of the patents-in-suit have been the subject of prior litigation: *SuperSpeed v.*

*Oracle Corporation,* 4:04–cv–3409, filed in this district, and *SuperSpeed v. IBM Corporation,* 2:07–cv–89, filed in the Eastern District of Texas. Asserting that SuperSpeed granted a broad right to license the patents-in-suit to IBM, and that IBM and Google have a cross-license agreement that, by its unambiguous terms, grants Google a license to all patents to which IBM has a license, including the patents-in-suit, Google argues that it is entitled to summary judgment of non-infringement because it cannot infringe patents it is licensed to practice.[1] SuperSpeed argues that Google is not entitled to summary judgment because although IBM is authorized to license products and services practicing SuperSpeed's patented technology to third parties such as Google, IBM is not authorized to license the patents-in-suit.[2] Accordingly, SuperSpeed argues that it is entitled to summary judgment on Google's licensing defense.[3] Neither party argues that the contractual agreements at issue are ambiguous. However, SuperSpeed requests additional time to conduct discovery to determine IBM's understanding of the cross-licensing agreement with Google if the court determines there is ambiguity.[4]

## II. Standard of Review

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed.R.Civ.P. 56(c). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liber-*

1. Defendant Google Inc.'s Motion for Summary Judgment of Non–Infringement Based on Its Licensing Defense ("Google's MSJ"), Docket Entry No. 105, p. 1.

2. Plaintiff SuperSpeed, LLC's Response to Defendant Google Inc.'s Motion for Summary Judgment of Non–Infringement and Cross-Motion for Summary Judgment on Google's

"Licensing Defense" ("SuperSpeed's Cross–MSJ"), Docket Entry No. 114, pp. 2–11.

3. *Id.* at 10–11.

4. *Id.* (citing Declaration of Adam Carlis, Exhibit H thereto, Docket Entry No. 114–9).

*ty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*), (quoting *Celotex,* 106 S.Ct. at 2553).

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Id.* (citing *Celotex,* 106 S.Ct. at 2553–2554). *See also Bellard v. Gautreaux,* 675 F.3d 454, 460 (5th Cir.2012) ("[T]he evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial."). "[T]he nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little,* 37 F.3d at 1075. In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when ... both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075.

■■■ "Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.,* 43 F.3d 644, 646 (Fed.Cir.1994) (citing Fed.R.Civ.P. 56(c)). Summary judgment is also appropriate on license issues if the patentee is unable to set forth specific facts why the license should not apply. *See Cyrix Corp. v. Intel Corp.,* 879 F.Supp. 666 (E.D.Tex.1995) (granting summary judgment to licensee). Licensing agreements are generally interpreted under state law. *Id.* at 668 (applying state law). *See also General Mills, Inc. v. Kraft Foods Global, Inc.,* 487 F.3d 1368, 1373 (Fed.Cir. 2007) (interpreting patent license transfer provisions under state law).

### III. *Undisputed Facts*

On March 16, 2007, SuperSpeed sued IBM in the Eastern District of Texas alleging infringement of a group of patents, including the patents-in-suit.[5] SuperSpeed alleged that IBM "infringed ... the '244, '226 ... patents by making, using, selling, and offering to sell, within the United States products that come within the scope of the patents."[6] On April 17, 2009, SuperSpeed and IBM entered into a Settle-

---

**5.** *See* Complaint filed in *SuperSpeed LLC v. IBM Corporation,* Civil Action 2–07–cv–089, Eastern District of Texas, Exhibit A to Google's MSJ, Docket Entry No. 105–2.

**6.** *Id.* at 6 ¶ 25.

ment Agreement [7] and a Patent License Agreement.[8] Section 2.1 of the License Agreement provides:

Subject to payment according to Section 3.1, LICENSOR grants to IBM a paid-up, nonexclusive, irrevocable worldwide license under the LICENSED PATENTS to make, have made, use, import, offer for sale, lease, license, sell and/or otherwise transfer any products, services, and to practice and/or have practiced any process or method. IBM shall have the right to grant sublicenses of the same or lesser scope to (i) its subsidiaries and others owned or controlled by it (collectively "Affiliates"), and such sublicenses may allow such Affiliates to likewise grant sublicenses of the same or lesser scope to their Affiliates, and (ii) any third party to which, after the EFFECTIVE DATE, IBM or any of its Affiliates transfers a line of products and/or services to the extent of the line of products and services transferred. LICENSOR irrevocably releases IBM, its Affiliates, and their respective customers, distributors and suppliers from any and all claims of infringement of the LICENSED PATENTS which claims are based on acts prior to the EFFECTIVE DATE, which, had they been performed after the EFFECTIVE DATE would have been licensed under this AGREEMENT.[9]

Under the SuperSpeed–IBM Patent License Agreement "licensed patents"

shall mean U.S. Patent 5,777,226 [sic], 5,918,244 ... and all patents and applications, if any, related to, claiming

priority from, or deriving from the application for such patent (including divisionals, continuations, continuations-in-part, corresponding patents and applications in other countries) and all reissues and reexaminations of any of the patents." [10]

The SuperSpeed–IBM Patent License Agreement states that "[t]his AGREEMENT shall be construed ... in accordance with the law of the State of Texas, USA, as such law applies to contracts signed and fully performed in Texas, without regard to conflict of law principles." [11]

On September 29, 2006, IBM and Google entered into a Patent Cross License Agreement ("IBM–Google Cross License Agreement").[12] Section 2.1.1 of the IBM–Google Cross License Agreement provides:

IBM, as Grantor, on behalf of itself and its Subsidiaries grants to GOOGLE, as Grantee, a nonexclusive and worldwide license under Grantor's Licensed Patents:

(a) to make (including the right to use any apparatus and practice any method in making), use, import, have imported, offer for sale, lease, license, sell and/or otherwise transfer or provide Grantee Licensed Products; for the avoidance of doubt, the right to license Grantee Licensed Products provided in this Section 2.1.1(a) includes the right to grant such licensees the right to further sublicense said Grantee Licensed Products;

---

7. *See* SuperSpeed–IBM Settlement Agreement, Exhibit B to Google's MSJ, Docket Entry No. 105–3.

8. *See* SuperSpeed–IBM Patent License Agreement, Exhibit C to Google's MSJ, Docket Entry No. 105–4.

9. *Id.* § 2.1.

10. *Id.* § 1.

11. *Id.* § 5.4.

12. *See* Patent Cross License, Exhibit G to Google's MSJ, Docket Entry No. 105–8.

(b) to have Grantee Licensed Products made by a third party for the use, importation, offer for sale, lease, sale and/or other transfer or provision by Grantee or Grantee's Subsidiaries only when the conditions set forth in Section 2.2 are met; and

(c) to use any GOOGLE Licensed Product in connection with the Performance of Business Processes for itself or third parties.

A particular Licensed Product, or use of any apparatus or practice of any method in connection with the Performance of Business Processes, shall be licensed under only those of: (a) Grantor's Licensed Patents that exist in the country where Grantee made, used, imported, had imported, offered for sale, leased, licensed, sold, and/or otherwise transferred such Licensed Product, or used any such apparatus or practiced any such method in connection with the Performance of Business Processes, and which, but for the license granted herein would have been infringed (including contributory infringement) by the performance of such acts; and (b) Grantor's Licensed Patents that exist in any country other than where Grantee performed such acts and which, but for the license granted herein would have been infringed (including contributory infringement) if Grantee's performance of such acts had occurred in the country where such Licensed Patents exist.[13]

Under the IBM–Google Cross License Agreement "licensed patents"

shall mean all patents worldwide, including utility models and typeface design patents and registrations (but not including any other design patents or registrations):

(a) issued or that ever issue on patent applications entitled to an effective filing date prior to September 29, 2006; and

(b) under which patents or the applications therefor a party hereto or any of its Subsidiaries has as of the Agreement Date, or thereafter obtains, the right to grant licenses to Grantee of or within the scope granted herein without such grant or the exercise of rights thereunder resulting in the payment of royalties or other consideration by Grantor or its Subsidiaries to third parties (except for payments among Grantor and its Subsidiaries, and payments to third parties for inventions made by said third parties while employed by Grantor or any of its Subsidiaries).

Licensed Patents shall include said (i) patents and patent applications, and (ii) continuations-in-part, divisionals, continuations or said patent applications, and all reissues, reexaminations, and extensions of any of the aforesaid patents or issuing from the aforesaid patent applications ...[14]

The IBM–Google Cross License Agreement states that "[t]his Agreement shall be construed ... in accordance with the law of the State of New York, USA, as such law applies to contracts signed and fully performed in New York."[15]

## IV. *Analysis*

Google argues that it is entitled to summary judgment on SuperSpeed's infringement claim because § 2.1 of the SuperSpeed–IBM Patent License Agreement expressly granted IBM the right to license

13. *Id.* § 2.1.1.

14. *Id.* § 1.

15. *Id.* § 8.11.

SuperSpeed's patents; and pursuant to the IBM–Google Cross License Agreement, IBM licensed those patents to Google. SuperSpeed argues that Google is not entitled to summary judgment because Google's interpretation of the Super-Speed–IBM Patent License Agreement is wrong for at least four reasons:

1. The agreement[']s plain language refers to licensing (software) products, not patents.

2. Other provisions of the agreement reference IBM's right to license its products and services. Those provisions would be incoherent if Section 2.1 authorized IBM to license *patents*, rather than *products*.

3. Google's interpretation renders superfluous key provisions of the agreement.

4. Google's interpretation creates absurd results, including vesting IBM with the right to sell SuperSpeed's patents.[16]

SuperSpeed also argues that the IBM–Google Cross License Agreement confirms that IBM is not authorized to license the patents-in-suit to Google. In response Google reiterates its argument that when read together the SuperSpeed–IBM Patent License Agreement and the IBM–Google Cross License Agreement authorize Google to practice the patents-in-suit. Google also argues that SuperSpeed's interpretation renders portions of the Super-Speed–IBM Patent License Agreement superfluous, and that discovery is not needed because the contractual agreements at issue are not ambiguous.[17]

## A. Applicable Law

### 1. *Licensing Defense*

■■■ The grant of a patent conveys to the patentee the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States, importing the invention into the United States, and, if the invention is a process, the right to exclude others from using, offering for sale, or selling throughout the United States or importing into the United States products made by that process. *See* 35 U.S.C. § 154(a)(1). The Federal Circuit has explained that this right to exclude means that when a patentee grants a license, a "patentee can only convey a freedom from suit." *TransCore, LP v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed.Cir.2009). A license of a patent is merely an agreement between the patentee and the licensee that the patentee will not sue the licensee for infringement of his exclusive right (in return for consideration of some sort). By granting a license a patentee is not affirmatively granting any share of the patent right itself, but is merely agreeing to forebear from suing the licensee for infringement of the patentee's rights under the patent. *See General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175, 58 S.Ct. 849, 852, 82 L.Ed. 1273 (1938) ("The Transformer Company was not an assignee; it did not own the patents or any interest in them; it was a mere licensee under a nonexclusive license, amounting to no more than 'a mere waiver of the right to sue.' "). *See also De Forest Radio Telephone & Telegraph Co. v. United States*, 273 U.S. 236, 47 S.Ct. 366, 368, 71 L.Ed. 625 (1927) (quoting *The Case of Henry v.*

---

**16.** SuperSpeed's Cross–MSJ, Docket Entry No. 114, p. 3.

**17.** Defendant Google Inc.'s Reply to Plaintiff SuperSpeed, LLC's Response to Google Inc.'s Motion for Summary Judgment of Non–In-fringement and Cross–Motion for Summary Judgment on Google Inc.'s "Licensing Defense" ("Google's Reply"), Docket Entry No. 118.

*Dick Co.,* 224 U.S. 1, 32 S.Ct. 364, 370, 56 L.Ed. 645 (1912), *overruled on other grounds by Motion Picture Patents Co. v. Universal Film Manufacturing Co.,* 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917) ("If a licensee be sued, he can escape liability to the patentee for the use of his invention by showing that the use is within his license; but, if his use be one prohibited by the license, the latter is of no avail as a defense. As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee.")). The forbearance granted the licensee is personal in nature. *See Gilson v. Republic of Ireland,* 787 F.2d 655, 658 (D.C.Cir.1986) ("It is well settled that a non-exclusive licensee of a patent has only a personal and not a property interest in the patent and that this personal right cannot be assigned unless the patent owner authorizes the assignment or the license itself permits assignment."); *Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Co.,* 284 F.3d 1323, 1328 (Fed.Cir.2002) ("[C]ourts generally have acknowledged the need for a uniform national rule that patent licenses are personal and non-transferable in the absence of an agreement authorizing assignment, contrary to the state common law rule that contractual rights are assignable unless forbidden by an agreement."). A patent license is "governed by ordinary principles of state contract law." *State Contracting & Engineering Corp. v. State of Florida,* 258 F.3d 1329, 1339 (Fed.Cir. 2001). *See also Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 1099, 59 L.Ed.2d 296 (1979).

### 2. *Law of Contract Construction*
#### (a) Texas Law

■ General principles of contract interpretation have been articulated by the Texas Supreme Court. *See Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983). The court's first task is to determine whether the contract is enforceable as written without resort to extrinsic evidence. *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.,* 736 F.3d 375, 377 (5th Cir.2013) (citing *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003)). The court's primary objective is "to ascertain the true intentions of the parties as expressed in the instrument." *Coker,* 650 S.W.2d at 393. "To achieve this objective, the court should examine the entire contract in order to 'harmonize and give effect to all of its provisions so that none will be rendered meaningless.'" *McLane Foodservice,* 736 F.3d at 377–78 (quoting *Webster,* 128 S.W.3d at 229). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker,* 650 S.W.2d at 393. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* at 394.

■ When application of the pertinent rules of contract interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning, the contract is ambiguous. *Id.* (citing *Skelly Oil Co. v. Archer,* 163 Tex. 336, 356 S.W.2d 774, 778 (1962)). A contract is not ambiguous merely because of a simple lack of clarity, or because the parties proffer conflicting interpretations of a term. *DeWitt County Electric Cooperative, Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999). Extrinsic evidence is not admissible for the purpose of creating an ambiguity. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951). "Only where a contract is first determined to be ambiguous may the courts consider the parties'

interpretation, and admit extraneous evidence to determine the true meaning of the instrument." *Kelley–Coppedge, Inc. v. Highlands Insurance Co.*, 980 S.W.2d 462, 464 (Tex.1998).

#### (b) New York Law

■■■■ "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide." *International Multifoods Corp. v. Commercial Union Insurance Co.*, 309 F.3d 76, 83 (2d Cir.2002) (citations omitted). *See also Mallad Construction Corp. v. County Federal Savings and Loan Association*, 32 N.Y.2d 285, 344 N.Y.S.2d 925, 298 N.E.2d 96, 100 (1973). Where the language of a contract is unambiguous, the court looks to the language of the agreement and gives the words and phrases their plain meaning, as "the instrument alone is taken to express the intent of the parties." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir.1997). *See also Brooke Group Ltd. v. JCH Syndicate*, 87 N.Y.2d 530, 640 N.Y.S.2d 479, 663 N.E.2d 635, 638 (1996) ("The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning.").

### B. Application of Law to the Undisputed Facts

Section 5.4 of the SuperSpeed–IBM Patent License Agreement provides that it shall be construed in accordance with the law of the state of Texas, and § 8.11 of the IBM–Google Cross License Agreement provides that it shall be construed in accordance with the law of the state of New York. Under both Texas and New York law construction of a contract is a question of law to be decided by the court when the terms of the agreement are not ambiguous. *Coker*, 650 S.W.2d at 394; *Klos*, 133 F.3d at 168. The parties do not contend

that either agreement is ambiguous, and the court finds both agreements to be unambiguous. For the reasons explained below, the court concludes that when read together the two agreements do not license SuperSpeed's patents to Google.

1. *The SuperSpeed–IBM Patent License Agreement Does Not Grant IBM the Unfettered Right to License the Patents–In–Suit*

(a) Section 2.1 Authorizes IBM to License Products and Services, Not the Patents–In–Suit

Google argues that

the only reasonable interpretation of the SuperSpeed–IBM License Agreement is that SuperSpeed granted IBM the unfettered right to license the patents-in-suit. Section 2.1 of the SuperSpeed–IBM License Agreement is entitled "Grants of Rights." ... Specifically, in this section, SuperSpeed "grant[ed] to IBM a paid-up, nonexclusive, irrevocable worldwide license under the LICENSED PATENTS to make, have made, use[,] import, offer for sale, lease, *license*, sell, and/or otherwise transfer any products, services, and to practice and/or have practiced any process or method." ... This grant includes full rights to lease, license, and transfer under both of the patents-in-suit.... The only limitation on IBM's license was the requirement that IBM provide SuperSpeed with a lump sum payment .... (providing a complete and unlimited right to license to IBM that was only "[s]ubject to payment according to Section 3.1" of the SuperSpeed–IBM License Agreement.). For this unfettered right, IBM paid SuperSpeed $14.6 Million.[18]

---

18. Google's MSJ, Docket Entry No. 105, p. 6.

Google's contention that § 2.1 of the SuperSpeed–IBM Patent License Agreement provides IBM "the unfettered right to license the patents-in-suit" is based on a reading of the first sentence of the Agreement that is contradicted not only by the language of the first sentence, but also by the language of the second sentence of § 2.1 and by other sections of the SuperSpeed–IBM Patent License Agreement.

The first sentence of § 2.1 of the SuperSpeed–IBM Patent License Agreement authorizes IBM to take certain actions "under" the "LICENSED PATENTS," which include the patents-in-suit, i.e. "LICENSOR grants to IBM a .. non-exclusive ... license ... under the LICENSED PATENTS,"[19] to "make, have made, use, import, offer for sale, lease, license, sell, and/or otherwise transfer any products, services,"[20] and to "practice and/or have practiced any-process or method."[21] Read together, these provisions grant to IBM a license to "license, sell, and/or otherwise transfer any products [or] services." Google's interpretation of the first sentence of § 2.1 to authorize IBM "the unfettered right to license the patents-in-suit" ignores the fact that "license" is a transitive verb, i.e., a verb that indicates an action that a subject exerts on an object. As SuperSpeed explains

> the subject is IBM, license is the verb, and the nouns "products" and "services" are the direct objects completing the thought: IBM may license products and services. Put another way, because "license" is a transitive verb, granting IBM a "license under the patents-in-suit

to ... license ..." necessarily begs the question: *What* is IBM authorized to license? The agreement provides the definitive answer: IBM can license any "products" or "services." Therefore, the provision properly reads: IBM has a "license under the patents-in-suit to ... license ... any products [or services]."[22]

Google's contention that the verb "license" as used in § 2.1 authorizes IBM to license the patents-in-suit requires the court to read the terms "patents" or "patents-in-suit" in place of the words "products" and "services." Such a reading would not only deprive the words "products" and "services" of their plain meanings, but for the reasons explained in § IV.B.1(b)-(c), below, would conflict with the use of these words in the second sentence of § 2.1 and in subsequent sections of the SuperSpeed–IBM Patent License Agreement.

Google argues in reply that SuperSpeed's

> "license for products" argument is incorrect because it relies on an incomplete and misleading reading of the first sentence of Section 2.1. In fact, SuperSpeed selectively quotes from the IBM/SuperSpeed Agreement at least three times, *see* Resp. at pp. 1, 4, and 9, each time omitting the final clause of the first sentence of Section 2.1, which grants IBM the *additional right* under the patents-in-suit "to practice and/or have practiced any process or method." ... Each of the asserted claims of the '226 patent are method claims. D[ocket] I[nstrument] 101–2 at Claims 27 and 30–33. With respect to at least these five claims, SuperSpeed's attempts to

---

**19.** SuperSpeed–IBM Patent License Agreement, Exhibit C to Google's MSJ, Docket Entry No. 105–4, § 2.1.

**20.** *Id.*

**21.** *Id.*

**22.** SuperSpeed's Cross–MSJ, Docket Entry No. 114, pp. 4–5.

retroactively limit the unambiguous scope of its license to IBM falls flat.[23]

SuperSpeed responds that it cited the allegedly missing phrase several times in its initial response to Google's motion for summary judgment, and that "omitting the phrase could not possibly be 'misleading[,]' ... because *IBM's* right 'to practice and/or have practiced any process or method' has no impact on the current dispute between SuperSpeed and *Google*."[24] The court agrees. Because the issue in dispute involves the scope of IBM's ability to license SuperSpeed's patents-in-suit to third parties such as Google, the fact that the SuperSpeed–IBM Patent License Agreement authorized IBM to practice and have practiced any process or method is not relevant to the parties cross-motions for summary judgment.

**(b) IBM's Authority to Grant Sublicenses Does Not Extend to Google**

■ The second sentence of § 2.1 of the SuperSpeed–IBM Patent License Agreement governs IBM's ability to grant sublicenses, i.e., it provides that

IBM shall have the right to grant sublicenses of the same or lesser scope to (i) its subsidiaries and others owned or controlled by it (collectively "Affiliates"), ... and (ii) any third party to which, after the EFFECTIVE DATE, IBM or any of its Affiliates transfers a line of products and/or services to the extent of the line of products and services transferred.[25]

Google does not dispute that it is neither an IBM "Affiliate" nor a third party to which IBM or one of its Affiliates has transferred a line of products or services. Instead, Google argues that

the first clause of section 2.1 of the SuperSpeed–IBM License Agreement confers IBM with a clear and unlimited right to license the patents-in-suit.... The second clause of that same section sets forth two exemplary scenarios whereby IBM can grant sublicenses, but this provision is not limiting.... The SuperSpeed–IBM License Agreement does not say that IBM can *only* issue sublicenses in the circumstances enumerated.... Nor does it say that IBM's licensing rights are *limited* to the examples set forth in Section 2.1.... Indeed, reading the entire agreement as a whole, it is plain that IBM sought, and obtained, a broad right to license.... This broad right extends to sublicenses to IBM's customers and affiliates, a fact that the SuperSpeed–IBM License Agreement specifies.[26]

The court is not persuaded by Google's argument. If, as Google contends, the first sentence of § 2.1 provided IBM "the unfettered right to license the patents-in-suit,"[27] there would be no need for the second sentence to describe the circumstances in which IBM could grant sublicenses under the patents. Google's reading of the second sentence of § 2.1 as not limiting but merely exemplary, renders the second sentence meaningless. Such a reading contradicts Texas law. *Coker*, 650 S.W.2d at 394 (requiring courts to "favor an interpretation that affords some consequence to each part of the instrument so

---

**23.** Google's Reply, Docket Entry No. 118, p. 3.

**24.** SuperSpeed's Sur–Reply to Google's Motion for Summary Judgment, Docket Entry No. 120, p. 4.

**25.** SuperSpeed–IBM Patent License Agreement, Exhibit C to Google's MSJ, Docket Entry No. 105–4, § 2.1.

**26.** Google's MSJ, Docket Entry No. 105, pp. 7–8.

**27.** *Id.* at 6.

that none of the provisions will be rendered meaningless").

As a nonexclusive licensee IBM received only a personal right and not a property interest in the patents-in-suit; and absent express authorization from SuperSpeed, IBM could not transfer or assign the personal right provided by the nonexclusive license. *See Gilson*, 787 F.2d at 658; *Rhone–Poulenc Agro*, 284 F.3d at 1328. Thus, as SuperSpeed argues, "[t]he second sentence's express authorization to sublicense is necessary only because the first sentence says nothing about IBM's right to license SuperSpeed's patents."[28] Because the second sentence of § 2.1 only authorizes IBM to grant sublicenses to Affiliates and third parties to whom IBM or one of its Affiliates has transferred a line of products or services, Google's contention that the SuperSpeed–IBM Patent License Agreement provided IBM "the unfettered right to license the patents-in-suit" has no merit. And because Google does not argue that it is an IBM Affiliate or a third party to whom IBM or one of its Affiliates has transferred a line of products or services, Google is not a party IBM is authorized to sublicense.

### (c) Google's Interpretation of § 2.1 Renders Other Sections of the Agreement Meaningless

The court's conclusion that § 2.1 authorizes IBM to license products or services—not the patents-in-suit—finds additional corroboration from the use of the words "products" and "services" in §§ 2.2 and 2.3 of the SuperSpeed–IBM Patent License Agreement. Section 2.2 provides:

A product or program which, if manufactured or copied by IBM, would be li-

censed under Section 2.1, shall also be deemed to be licensed under Section 2.1 if manufactured or copied by any Authorized Manufacturer on behalf of IBM as an IBM branded product. A service, which if provided by IBM, would be licensed under Section 2.1, shall also be deemed to be licensed under Section 2.1 if provided by any third party that, pursuant to an agreement with or authorization from IBM, provides such service on behalf of IBM as an IBM branded service.[29]

Section 2.2's express references to "a product" and to "a service" licensed under § 2.1 are coherent only if § 2.1 authorizes IBM to license products and services. If, as Google contends, the words "products" and "services" are read out of § 2.1 in favor of "patents" or "patents-in-suit," § 2.2 would become superfluous and, therefore, meaningless. Such a reading contradicts Texas law. *Coker*, 650 S.W.2d at 394. The same is true for § 2.3, which addresses SuperSpeed's covenant not to sue certain IBM customers who combine products purchased, licensed, or otherwise obtained from IBM with other products and then sell the resulting combination.

Section 2.3 provides:

LICENSOR covenants not to sue direct and indirect customers of products leased, licensed, sold or otherwise transferred by IBM or its Affiliates within the scope of the license herein, under the LICENSED PATENTS for the formation of any combination of such products with other products, and for the use or sale of such combinations that have been formed by said customers, notwithstanding that such other products are

---

28. SuperSpeed's Cross–MSJ, Docket Entry No. 114, p. 8.

29. SuperSpeed–IBM Patent License Agreement, Exhibit C to Google's MSJ, Docket Entry No. 105–4, § 2.2.

not furnished by IBM or its Affiliates.[30] As SuperSpeed argues,

> SuperSpeed's agreement not to sue "customers of products leased, licensed, sold, or otherwise transferred by IBM" only makes sense (and only is necessary) if IBM is authorized to lease, license, sell, or otherwise transfer products practicing SuperSpeed's inventions. Otherwise, there would be no customers for SuperSpeed to sue. Section 2.1 authorizes IBM to make such transfers, and Section 2.3 provides corresponding protections for IBM's customers, thus harmonizing the two provisions. Indeed, Sections 2.1 and 2.3 rely on parallel structure: Section 2.1 permits IBM to **"lease, license, sell and/or otherwise transfer** any *products*" and Section 2.3 refers to *"products* **leased, licensed, sold or otherwise transferred."** . . . Both provisions undoubtedly reference IBM's right to license *products* practicing the claimed inventions (rather than the patents themselves).[31]

If, as Google contends, the word "products" was read out of § 2.1 in favor of "patents" or "patents-in-suit," then the references to products in § 2.3 would become meaningless. Such a reading contradicts Texas law. *Coker,* 650 S.W.2d at 394.

2. *The IBM–Google Cross License Agreement Does Not License Super-Speed's Patents to Google*

Google argues that pursuant to the IBM–Google Cross License Agreement, Google received "full rights to any and all IBM patent rights," [32] and that pursuant to this grant of rights "Google's activities are licensed and there is no genuine issue as to

any material fact that Google does not infringe the patents-in-suit." [33] Super-Speed argues that Google's activities are not licensed because the patents-in-suit are not among the enumerated Licensed Patents identified by the parties. SuperSpeed explains that

> [t]he 2006 cross license agreement defined "Licensed Patents" in part as patents under which a party has "the right to grant licenses." . . . The agreement also includes a partial list of "IBM Licensed Patents." . . . SuperSpeed's patents are not listed. When IBM and Google amended their agreement in 2010, they added another 75 patents to the list of IBM Licensed Patents. Despite having obtained its license from SuperSpeed just a year earlier, IBM did not include SuperSpeed's patents on the amended list. It appears that IBM correctly recognizes that it lacks "the right to grant licenses to [Google]" under those patents, and therefore they are not "Licensed Patents." [34]

For the reasons stated in § IV.B.1(b), above, the court has already concluded that the SuperSpeed–IBM Patent License Agreement granted IBM the ability to grant sublicenses only to IBM Affiliates and third parties to which IBM or one of its Affiliates has transferred a line of products or services, and that Google was neither an IBM affiliate nor a third party to whom IBM or one of its Affiliates has transferred a line of products or services. IBM's ability to sublicense SuperSpeed's patents-in-suit therefore did not extend to Google. Because IBM's ability to sublicense SuperSpeed's patents-in-suit did not

---

30. *Id.* at § 2.3.

31. SuperSpeed's Cross–MSJ, Docket Entry No. 114, p. 7.

32. Google's MSJ, Docket Entry No. 105, p. 9.

33. *Id.*

34. SuperSpeed's Cross–MSJ, Docket Entry No. 114, pp. 9–10.

extend to Google, the IBM–Google Cross License Agreement does not license SuperSpeed's patents-in-suit to Google.

## V. *Order*

Defendant Google Inc.'s Motion for Summary Judgment of Non–Infringement Based on Its Licensing Defense (Docket Entry No. 105) is **DENIED.** Plaintiff SuperSpeed, LLC's Cross–Motion for Summary Judgment on Google's "Licensing Defense" (Docket Entry No. 114) is **GRANTED.**