**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 15, 2013

No. 12-50980

Lyle W. Cayce
Clerk

MCLANE FOODSERVICE,INC., a Texas Corporation,

Plaintiff-Appellant

v.

TABLE ROCK RESTAURANTS, L.L.C., a Delaware limited liability company;
SCOT WEDERQUIST; PETER ROOK

Defendants-Appellees

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS and JONES, Circuit Judges, and MILAZZO,[*] District Judge.

MILAZZO, District Judge:

Appellant McLane Foodservice, Inc. ("McLane") filed suit to recover certain debts owed by Table Rock Restaurants, LLC ("Table Rock") for goods and services provided by McLane in 2010. McLane also sought to recover the debts from Appellee Scot Wederquist ("Wederquist") by virtue of a guaranty agreement. Following a one-day bench trial, the district court entered judgment in favor of McLane but only as to Table Rock. On appeal, McLane argues the district court erred in holding that Wederquist is not personally liable under the

---

[*] District Judge for the Eastern District of Louisiana, sitting by designation.

No. 12-50980

guaranty agreement.  Because the guaranty agreement does not on its face apply to credit extended by McLane, we affirm.

I.

In January or February of 1997, Border Patrol of Wisconsin, Inc. ("Border Patrol") negotiated with Pepsico., Inc. ("Pepsico") for the purchase of nine Taco Bell franchises.  Pepsico required Border Patrol to apply for credit with PFS, a Division of PepsiCo., Inc. ("PFS"), as a condition precedent for approval.[1]  On March 24, 1997, Wederquist executed a personal guaranty in favor of PFS to secure the debts of Border Patrol (the "Guaranty").[2]  Wederquist owns a 25% interest in Border Patrol and serves as its treasurer.

On July 11, 1997, PFS sold its United States and Canadian operations to Ameriserve Food Distribution, Inc. ("Ameriserve") in an asset purchase transaction.  On January 31, 2000, Ameriserve filed a Chapter 11 bankruptcy case in the United States Bankruptcy Court for the District of Delaware.  The Bankruptcy Court approved the sale of "substantially all" of Ameriserve's assets to McLane on November 28, 2000.

On June 2, 2010, McLane contracted with Table Rock to sell food and goods to Table Rock restaurants.  Wederquist owns a 40% interest in and serves as treasurer of Table Rock, which was organized in 2007.  Table Rock ceased doing business on November 16, 2010, at which time it owed McLane $447,465.53 (the "Table Rock Debts").

On December 29, 2010, McLane filed suit against Table Rock and Wederquist in Texas state court to recover the Table Rock Debts.  This matter was removed and eventually tried before the bench on August 13, 2012.  The court found in favor of McLane and against Table Rock in the amount of the

---

[1] At the time, PFS supplied goods and services to Taco Bell franchisees.

[2] Despite the existence of the Guaranty, PFS never extended credit to Border Patrol.

2

No. 12-50980

Table Rock Debts. The court denied relief against Wederquist, holding that he was not personally liable for the Table Rock Debts under the Guaranty Agreement.  McLane appealed.

## II.

Under Rule 52 of the Federal Rules of Civil Procedure, a district court's findings of fact are reviewed for clear error and its conclusions of law *de novo*. *Walker v. City of Mesquite, Tex.*, 402 F.3d 532, 535 (5th Cir. 2005) (citation omitted).  The interpretation of a contract—including whether the contract is ambiguous—is a question of law, which we review *de novo*. *Prescott v. Northlake Christian Sch.*, 369 F.3d 491, 495 (5th Cir. 2004) (citation omitted).  If a contract is ambiguous, the district court's findings of fact as to the intent of the parties are reviewed for clear error.  *Id.* (citation omitted).

## III.

## A.

In a diversity case involving the interpretation of a contract, we apply the substantive law of the forum state, including its choice-of-law rules.  *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 314 (5th Cir. 1988) (citations omitted).  Although the Guaranty was executed in Wisconsin, it explicitly provides for the application of Texas law.  The parties agree that Texas substantive law governs this dispute.

We interpret the Guaranty as we would any other written agreement, according to the general principles of contract interpretation articulated by the Texas Supreme Court.  *See generally Coker v. Coker*, 650 S.W. 2d 391(Tex. 1983).  Our first task is to determine whether the contract is enforceable as written, without resort to parole evidence.  *J.M. Davidson, Inc. v. Webster*, 128 S.W. 3d 223, 229 (Tex. 2003).  The primary objective of the reviewing court is to ascertain the intentions of the parties as expressed in the contract.  *Lopez v. Munos, Hockema & Reed, L.L.P.*, 22 S.W. 3d 857, 861 (Tex. 2000) (citation omitted).  To

achieve this objective, the court should examine the entire contract in order to "harmonize and give effect to all of its provisions so that none will be rendered meaningless." *Webster*, 128 S.W. 3d at 229 (citation omitted). A contract is unambiguous if it can be given a definite or certain legal meaning. *Id.* (citation omitted). Ambiguity does not arise because of a "simple lack of clarity," or because the parties proffer different interpretations of the contract. *Dewitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W. 3d 96, 100 (Tex. 1999) (citations omitted). Rather, a contract is ambiguous only if it is subject to two or more reasonable interpretations after applying the pertinent canons of construction. *Webster*, 128 S.W. 3d at 229 (citation omitted). If the contract is ambiguous, courts may consider parole evidence for the purpose of ascertaining the parties' intent. *David J. Sacks, P.C. v. Haden*, 266 S.W. 3d 447, 450–51 (Tex. 2008).

A guarantor under Texas law is a "so-called favorite of the law and as such, a guaranty agreement is construed strictly in [his] favor." *Haggard v. Bank of Ozarks, Inc.*, 668 F.3d 196, 199 (5th Cir. 2012) (internal quotation marks and citation omitted). Thus, "[w]here uncertainty exists as to the meaning of a contract of guaranty, its terms should be given a construction which is most favorable to the guarantor." *Coker*, 650 S.W. 2d at 394 n.1 (citations omitted).

B.

Although the parties invite us to entertain multiple issues on appeal, we need only address but one: whether the Guaranty secures credit extended by McLane. Section 1 of the Guaranty provides that the guarantor (Wederquist) "unconditionally guarantees the punctual payment when due . . . of any and all indebtedness . . . *to Creditor* now or hereafter existing." (emphasis added). The preamble to the Guaranty defines "Creditor" as "[PFS] . . . and all affiliates of PFS." When read together, these provisions clearly and unambiguously provide that the Guaranty only applies to credit extended by PFS and its affiliates.

No. 12-50980

Thus, the issue before the Court is whether McLane is an affiliate of PFS so as to bring the Table Rock Debts within the ambit of the Guaranty.

The district court explicitly stated in its findings of fact that "McLane is not . . . an affiliate of PFS." As a preliminary matter, it is unclear whether this statement is a finding of fact or conclusion of law. If the district court interpreted the Guaranty, the interpretation is a conclusion of law, which we review *de novo. See S. Cent. Bell Tel. Co. v. Allnet Commc'ns Servs., Inc.*, 986 F.2d 1418, at *4 (5th Cir. 1993) (unpublished opinion) ("[B]ecause the district court mistakenly called an interpretation of contract a finding of fact, we are not bound by the clearly erroneous standard in our review of that interpretation."). If, on the other hand, the district court merely stated a finding of fact, our review is limited for clear error.

Assuming *arguendo* a *de novo* standard of review, we must independently determine whether McLane is an affiliate of PFS. The Guaranty does not define the term "affiliate." Under Texas law, words not defined in a contract are to be given their "plain and ordinary meaning." *Certain Underwriters at Lloyds, London v. Law*, 570 F.3d 574, 577 (5th Cir. 2009) (internal quotation marks and citation omitted). Black's Law Dictionary defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." Black's Law Dictionary (9th ed. 2009).[3] There is no evidence in the record, nor has either party argued, that McLane is an affiliate of PFS. In fact, such a relationship would be virtually impossible given that PFS sold its United States and Canadian operations to Ameriserve in 1997—10 years prior to the formation of McLane. Thus, the record is clear that McLane is not an affiliate of PFS, and therefore is not a

---

[3] Texas courts have cited Black's Law dictionary when interpreting undefined terms in a contract. *See, e.g.*, *Gray & Co. Realtors, Inc. v. Atl. Hous. Found., Inc.*, 228 S.W. 3d 431, 434–35 (Tex. App. 2007).

"Creditor" whose accounts are secured by the Guaranty. Accordingly, there is simply no basis for holding Wederquist personally liable for the Table Rock Debts under the Guaranty.

McLane attempts in vain to rebut this argument by citing a separate provision of the Guaranty. Section 10 of the Guaranty provides as follows: "This Guaranty shall be binding upon [Wederquist], his or her heirs, personal representatives and assigns, and *shall inure to the benefit of and be enforceable by Creditor and its successors, transferees and assigns*." (emphasis added). McLane argues that as a successor, transferee, or assign of PFS,[4] the Guaranty inures to its benefit, thereby permitting McLane to enforce the Guaranty against Wederquist. We disagree.

That the Guaranty inures to McLane's benefit does not mean that the Guaranty secures credit extended by McLane. As explained *supra*, the definitions in the preamble and the provisions of Section 1 clearly provide that the Guaranty only secures credit extended by PFS and its affiliates. The proffered interpretation would impermissibly render these provisions mere surplusage. It is axiomatic when interpreting contracts of guaranty that "[c]ourts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless." *Coker*, 650 S.W. 2d at 394 (citation omitted). Following this mandate, the most logical interpretation of Section 10 is that it simply provides that the successors, transferees, and assigns of PFS and its affiliates may enforce the Guaranty to collect debts resulting from credit extended by PFS and its affiliates. In other words, whereas Section 1 and the definitions in the

---

[4] The district court explicitly found that McLane is not a successor, transferee, or assign of PFS. We need not review this finding for clear error, because even if McLane is a successor, transferee, or assign of PFS, McLane would still not be entitled to recover *any* debts—let alone the Table Rock Debts—from Wederquist.

No. 12-50980

preamble define which debts are secured by the Guaranty, Section 10 defines the entities that are entitled to enforce the Guaranty in order to collect those debts.[5] This interpretation best harmonizes the aforementioned provisions in the Guaranty so as to give each the meaning suggested by the contract as a whole. *See Valence Operating Co. v. Dorsett*, 164 S.W. 3d 656, 662 (Tex. 2005) ("[C]ourts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract.") (citations omitted). It also comports with the Texas maxim that guaranty agreements be strictly construed in favor of the guarantor. *See Haggard*, 668 F.3d at 199 (citation omitted); *Coker*, 650 S.W. 2d at 394 n.1 (Tex. 1983) (citations omitted).

## IV.

This appeal involves a straightforward issue of contractual interpretation. The Guaranty only secures credit extended by PFS and its affiliates. Because McLane is not an affiliate of PFS, the Table Rock Debts are not secured by the Guaranty. Accordingly, and for the reasons previously stated, we affirm. AFFIRMED.

---

[5] In fact, Section 10 does not purport to define the term "Creditor" whereas the preamble clearly does.