# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

─────────

No. 13-30156

United States Court of Appeals
Fifth Circuit

**FILED**
July 6, 2015

Lyle W. Cayce
Clerk

─────────

COMAR MARINE, CORPORATION,

       Plaintiff,

v.

RAIDER MARINE LOGISTICS, L.L.C., ETC.,

       Defendant.

-------------------------------------------------------------------------------------------------

CONQUEROR MARINE LOGISTICS, L.L.C.,

       Plaintiff,

JP MORGAN CHASE BANK, N.A.,

       Intervenor Plaintiff–Appellee,

v.

COMAR MARINE, L.L.C., formerly known as Comar Marine, Corporation, formerly known as Nautical Offshore Corporation,

       Defendant–Intervenor Defendant–Appellant.

---------------------------------------------------------------------------------

consolidated with 13-30819

No. 13-30156 c/w 13-30819

COMAR MARINE, CORPORATION, formerly known as Nautical Offshore Corporation,

Plaintiff Intervenor Defendant–Appellee Cross-Appellant,

v.

RAIDER MARINE LOGISTICS, L.L.C., in personam; CONQUEROR MARINE LOGISTICS, L.L.C., in personam; ENFORCER MARINE LOGISTICS, L.L.C., in personam

Defendants–Appellees,

MARAUDER MARINE LOGISTICS, L.L.C., in personam; TRACY P. LIRETTE, in personam; CHRIS ST. AMAND, in personam,

Defendants–Appellants Cross-Appellees,

JP MORGAN CHASE BANK, N.A.; ALLEGIANCE BANK TEXAS

Intervenor Plaintiffs–Appellees.

-------------------------------------------------------------------------------------------------

CONQUEROR MARINE LOGISTICS, L.L.C.; RAIDER MARINE LOGISTICS, L.L.C.; ENFORCER MARINE LOGISTICS, L.L.C.,

Plaintiffs–Appellants Cross-Appellees,

JP MORGAN CHASE BANK, N.A.

Intervenor Plaintiff–Appellee,

v.

COMAR MARINE, L.L.C., formerly known as Comar Marine, Corporation, formerly known as Nautical Offshore Corporation,

Defendant Intervenor Defendant–Appellee Cross-Appellant.

2

No. 13-30156 c/w 13-30819

Appeals from the United States District Court
for the Western District of Louisiana

Before STEWART, Chief Judge, OWEN, Circuit Judge, and MORGAN, District Judge.*

PRISCILLA R. OWEN, Circuit Judge:

This case involves a contract dispute between Comar Marine, LLC (Comar) and four vessel-owning LLCs.  Under the contracts, Comar managed the vessels on behalf of the vessel-owning LLCs.  The vessel-owning LLCs decided to terminate the agreements prematurely, and Comar sued for breach of contract.  JPMorgan Chase Bank (JPMorgan) and Allegiance Bank Texas (Allegiance) provided the financing for the vessel purchases and intervened to defend their preferred ship mortgages.  The district court granted summary judgment in favor of JPMorgan and Allegiance.  After a bench trial, the district court held, *inter alia*, that (1) the vessel-owning LLCs materially breached the agreements by terminating without cause, (2) the termination fee in the agreements was penal and thus unenforceable, (3) Comar did not have valid maritime liens on the vessels, and (4) Comar wrongfully arrested the vessels.  We affirm.

**I**

Chris St. Amand and Tracy Lirette agreed to purchase three vessels from Comar: the M/V Conqueror, the M/V Raider, and the M/V Enforcer.  Subsequently, St. Amand and Lirette agreed to purchase another ship, the M/V Marauder, from Comar.  St. Amand and Lirette purchased the vessels through a network of limited liability companies (collectively, with St. Amand and

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

3

Lirette, the Owners).   JPMorgan financed the purchases of the Conqueror, Raider, and Enforcer, while Allegiance provided financing for the Marauder. Both banks secured their loans with preferred ship mortgages.  As a condition precedent to the purchases, Comar required the Owners to enter into identical management agreements for each of the vessels.   Under the management agreements, the Owners appointed Comar to market, manage, and operate the vessels and to pay Comar a monthly management fee equal to the greater of $3,000 or 10% of the gross income from each vessel that month.  All expenses Comar incurred in connection with its provision of services were to be "reimbursed . . . from funds held on account of Owner[s]."

As the Gulf of Mexico charter market deteriorated, Lirette notified Comar by e-mail that the Owners were terminating their agreements effective immediately and had executed management agreements with another company.  Shortly thereafter, Comar filed in personam actions against Lirette, St. Amand, and the various LLCs and in rem actions against the four vessels, asserting breach of contract.  Comar alleged that it was owed both outstanding expenses as well as termination fees, totaling approximately $1,146,117.47. Comar sought and secured arrests of the four vessels, on the ground that its claims for necessaries and termination fees under the agreements gave rise to maritime liens.  The Owners filed counterclaims against Comar, asserting, *inter alia*, wrongful arrest of the vessels.  JPMorgan and Allegiance both intervened in the litigation in order to defend their rights as preferred mortgagees.

The district court set bonds on the four vessels.  With a loan from Allegiance, the Owners were able to pay the bond to secure the release of the Marauder.  JPMorgan, however, was unwilling to lend further funds to the Owners; as a result, the Owners placed the LLCs owning the Raider, Enforcer, and Conqueror into bankruptcy.  The Marauder was under seizure for 35 days,

and the three other vessels for 37 days, during which they could not be chartered or otherwise profitably used.

As the litigation proceeded, Comar withdrew its claim for unpaid expenses and necessaries because the funds obtained from collecting outstanding accounts receivable were sufficient to satisfy those expenses. JPMorgan and Allegiance filed motions for summary judgment contending that Comar did not have maritime liens on the vessels. The district court granted the banks' motions. Comar appealed with respect to JPMorgan pursuant to 28 U.S.C. § 1292(a)(3).[1]

The remaining parties proceeded to a bench trial. The district court held that although the Owners breached the agreements by terminating without cause, the termination fee was penal and therefore unenforceable. In lieu of the termination fee, the district court awarded Comar damages of $3,000 per month from the date of termination until the date the agreements were scheduled to expire. The court also held that St. Amand and Lirette were personally liable for these damages as the guarantors of the agreements. Additionally, the court held that Comar had wrongfully arrested the vessels. Nonetheless, it declined to award the Owners damages because it found the Owners had failed to introduce evidence establishing the extent of their damages with reasonable certainty.

Comar and the Owners each submitted postjudgment motions requesting, among other things, that the court amend the judgment to award prejudgment interest. The court granted the Owners' request to offset the damages owed to Comar by the excess of the accounts receivable and denied

---

[1] 28 U.S.C. § 1292(a)(3) ("[T]he courts of appeals shall have jurisdiction of appeals from . . . [i]interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.").

the remainder of the motions without discussion, citing "the Court's discretion and the 'peculiar circumstances' of this action." Both Comar and the Owners timely appealed the court's judgment; Comar also appealed the grant of summary judgment in favor of Allegiance. This court consolidated the appeals with Comar's interlocutory appeal of the district court's grant of summary judgment in favor of JPMorgan.

## II

We review the district court's grant of summary judgment in favor of Allegiance and JPMorgan de novo, "applying the same legal standard as the district court in the first instance."[2] Under that standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]

The district court granted summary judgment in favor of both JPMorgan and Allegiance on two alternative grounds. First, it held that the breach of the management agreements did not give rise to liabilities that created maritime liens, and accordingly, that JPMorgan's and Allegiance's preferred ship mortgages had priority over other claims against the vessels. In the alternative, the district court held that even if the breach did give rise to maritime liens, Comar was precluded from asserting them as a joint venturer. Comar challenges both conclusions.

Assuming the agreements at issue are maritime contracts, as the parties have stipulated, the remaining inquiry is whether breach of these contracts gave rise to maritime liens.[4] Maritime liens are "*stricti juris* and will not be

---

[2] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

[3] FED. R. CIV. P. 56(a).

[4] *Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 565 (5th Cir. 2003) ("[I]n determining whether a contract falls within admiralty, the true criterion is the

No. 13-30156 c/w 13-30819

extended by construction, analogy or inference."[5]   "Thus, to determine the validity of a maritime lien, we must normally refer to statutory law or those liens that have been historically recognized in maritime law."[6]

The Fifth Circuit has recognized that the breach of certain types of contracts gives rise to maritime liens.[7]   Comar does not contend that the management agreements of the sort it entered into with the Owners are one such historically recognized type.   Instead, it claims that the district court erred because the agreements are the functional equivalent, or at the very least analogous, to bareboat charters, contracts recognized as giving rise to maritime liens,[8] and such equivalency is sufficient to confer a maritime lien.

Our decision in *Walker v. Braus* provides a definition of a charter party:

> A "charter" is an arrangement whereby one person (the "charterer") becomes entitled to the use of the whole of a vessel belonging to another (the "owner"). . . . Under a bareboat or demise charter . . . the full possession and control of the vessel is transferred to the charterer. The stated consideration for a demise charter is payable periodically but without regard to whether the charterer uses the vessel gainfully or not.  Under a bareboat or demise charter the vessel is transferred without crew, provisions,

---

nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions." (alteration in original) (quoting *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 610 (1991))); *Wilkins v. Commercial Inv. Trust Corp.*, 153 F.3d 1273, 1276 (11th Cir. 1998) (stating the existence of a maritime contract is a prerequisite to a claim of a maritime lien rooted in contract).

[5] *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 12 (1920); *Racal Survey U.S.A., Inc. v. M/V Count Fleet*, 231 F.3d 183, 192 (5th Cir. 2000) (citing *Piedmont*, 254 U.S. at 12).

[6] *Racal Survey*, 231 F.3d at 192 (citing *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 224 (5th Cir. 1999)).

[7] *See Int'l Marine Towing, Inc. v. S. Leasing Partners, Ltd.*, 722 F.2d 126, 130-31 (5th Cir. 1983) (holding that the breach of a charter party, including a bareboat charter party, gives rise to a maritime lien); *E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia*, 876 F.2d 1168, 1175 (5th Cir. 1989) (recognizing that there is a specific "universe of maritime contracts which may give rise to a maritime lien," and this "universe" includes a time charter).

[8] *Int'l Marine Towing*, 722 F.2d at 130-31.

No. 13-30156 c/w 13-30819

fuel or supplies, i.e. "bareboat"; and when, and if, the charterer operates the vessel he must supply also such essential operating expenses. Because the charter's personnel operate and man the vessel during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability.[9]

Like a bareboat charter, Comar had full possession and control of the vessels, carried insurance for the vessels, and used its own crew, but unlike such a charter, Comar did not pay for the vessels' expenses, including insurance, and did not owe the Owners a periodic payment independent of whether the vessels were used. Rather, the Owners paid Comar a management fee and reimbursed Comar for expenses, such as equipment, supplies, and repairs. Comar sought charters on behalf of the Owners and then revenue, net of the agreed charges, was remitted to the Owners. Additionally, under a bareboat charter, "[s]ervices performed on board the ship are primarily for [the charterer's] benefit."[10] Here, the services performed by Comar were primarily for the Owners' benefit. The management agreements in the present case are not the functional equivalent of bareboat charters.

Even were the management agreements similar to bareboat charters, the decisions on which Comar relies do not hold that breach of a contract analogous to one historically recognized as giving rise to a maritime lien is sufficient to impose such a lien.[11] At most, the Ninth Circuit has held, and this

---

[9] *Walker v. Braus*, 995 F.2d 77, 80-81 (5th Cir. 1993).

[10] *Reed v. S.S. Yaka*, 373 U.S. 410, 412 (1963).

[11] *See Krauss Bros. Lumber Co. v. Dimon S.S. Corp.*, 290 U.S. 117, 125 (1933) (determining a lien existed for overpayment of freight by mistake where such a lien had already been recognized for "overpayments similarly made but induced by other means"); *Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena*, 86 F.3d 908, 913-14 (9th Cir. 1996) (holding that a non-vessel-operating common carrier has the same right as a vessel owner or operator to assert a maritime lien for unpaid freight against the cargo it is responsible for transporting); *E.A.S.T. Inc.*, 876 F.2d at 1175 (agreeing with the district court that "breach of a time charter may create a maritime lien"); *Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 466-67 (5th Cir. 1984) (acknowledging, without holding, that "[c]onceivably,

court has intimated, that a contract may give rise to a maritime lien if it imposes practically identical rights and responsibilities as historically recognized contracts, such as a subcharter.[12]   As discussed above, the management agreements in the present case do not impose practically identical responsibilities as charters.   Comar's reliance on our unpublished decision in *Action Marine* is misplaced.[13]   While we did state that "breach of a maritime contract gives rise to a maritime lien despite the fact that no damage was sustained to the cargo," the citations supporting this statement were to our decisions in *International Marine Towing* and *Rainbow Line,* which stand for the uncontroversial proposition that breach of a charter gives rise to maritime lien.[14]   Our decision in *Action Marine* dealt with a towing contract, not a management agreement.[15]

Finally, while the management agreements stated that Comar "is relying on the credit of the Vessel[s] to secure payment of [the management fees and advanced sums for expenses] and shall have a maritime lien on the Vessel[s]," the Supreme Court has stated,

> [m]aritime liens are not established by the agreement of the parties, except in hypothecations of vessels, but they result from

---

even the breach of a sub-subcharter . . . could give rise to liens, under the theory that the subcharterer . . . was entrusted with the use of the vessel"); *Int'l Marine Towing,* 722 F.2d at 130-32 (holding that a bareboat charterer is "entitled to a maritime lien against the vessel for the owner's breach of the charter party"); *Rainbow Line, Inc. v. M/V Tequila,* 480 F.2d 1024, 1027 (2d Cir. 1973) ("The American law is clear that there is a maritime lien for the breach of a charter party, and because the damages sought to be recovered by Rainbow are all of a maritime nature and flow directly from the breach of the charter, it has a maritime lien." (footnotes omitted)).

[12] *See Logistics Mgmt.,* 86 F.3d at 913; *Cardinal Shipping,* 744 F.2d at 466-67.

[13] *Action Marine, Inc. v. Norseman, M/V,* 189 F.3d 470 (5th Cir. 1999) (unpublished table decision) (per curiam).

[14] *Id.* at *1 (citing *Int'l Marine Towing,* 722 F.2d at 130 and *Rainbow Line,* 480 F.2d at 1027).

[15] *Id.*

the nature and object of the contract. They are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist. They, too, are *stricti juris*.[16]

The district court correctly concluded that breach of the management agreements did not give rise to maritime liens.[17] We affirm the district court's grant of summary judgment in favor of Allegiance and JPMorgan. We do not reach whether the district court's alternate holding that Comar was a joint venturer and therefore foreclosed from asserting a maritime lien was erroneous.

## III

Regarding the litigation between the Owners and Comar, Comar challenges the district court's holdings that (1) the termination fees were penal and therefore unenforceable and (2) Comar wrongfully arrested the vessels following the Owners' termination. The Owners contest the district court's (1) decision to not award the Owners damages arising from Comar's wrongful arrest, (2) conclusion that St. Amand and Lirette personally guaranteed the agreements, and (3) calculation of Comar's damages. Both parties contest the district court's decision to not award prejudgment interest.

## A

"Whether a liquidated damage provision constitutes a penalty is a question of law,"[18] reviewable de novo.[19] "This court applies the two-part test

---

[16] *Newell v. Norton*, 70 U.S. 257, 262 (1865).

[17] *See Racal Survey U.S.A., Inc. v. M/V Count Fleet*, 231 F.3d 183, 193 (5th Cir. 2000) ("The lack of precedential authority and the stricti juris nature of a maritime lien are damning to TMI's cause, and we conclude that TMI's attempt to extend the concept of a maritime lien is unavailing.").

[18] *Louis Dreyfus Corp. v. 27,946 Long Tons of Corn*, 830 F.2d 1321, 1331 (5th Cir. 1987).

[19] *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013); *see also Theriot v. United States*, 245 F.3d 388, 394 (5th Cir. 1998) (per curiam)

set forth in the *Restatement (Second) of Contracts* § 356, comment b."[20]  The Restatement provides:

> [T]wo factors combine in determining whether an amount of money fixed as damages is so unreasonably large as to be a penalty.  The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches.  Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss.  The second factor is the difficulty of proof of loss.  The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty (see § 351), the easier it is to show that the amount fixed is reasonable.  To the extent that there is uncertainty as to the harm, the estimate of the court or jury may not accord with the principle of compensation any more than does the advance estimate of the parties.  A determination whether the amount fixed is a penalty turns on a combination of these two factors.  If the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm.  If, on the other hand, the difficulty of proof of loss is slight, less latitude is allowed in that approximation.  If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable.[21]

Under this court's precedent, the party seeking to invalidate the liquidated-damage provision has "the burden of proving that [it] is a penalty."[22]

---

("In an admiralty action tried by the court without a jury, the factual findings of the district court are binding unless clearly erroneous.  Questions of law are reviewed de novo." (citation omitted)).

[20] *Louis Dreyfus Corp.*, 830 F.2d at 1331.

[21] RESTATEMENT (SECOND) OF CONTRACTS § 356, comment b (citations omitted).

[22] *Farmers Exp. Co. v. M/V Georgis Prois*, 799 F.2d 159, 162 (5th Cir. 1986).

The termination-fee provision provides that if the Owners terminate the agreements, they are required to pay Comar "fifty (50%) percent of what COMAR would have earned as a Management Fee had [the] Agreement not been so terminated." "[W]hat COMAR would have earned" is

> calculated by determining the average gross daily charter hire earned by the Vessel from inception of [the] Agreement up through the date of termination for all days the Vessel has actually worked. This average gross daily charter hire rate will then be multiplied by the number of days remaining under [the] Agreement but for [the] early termination.

The agreements provide the following example:

> [I]f the Vessel's gross daily charter hire rate for days actually worked up through termination was $5,000 per day and there were 100 days left under [the] Agreement but for [the] early termination, Owner shall owe liquidated damages of $25,000 to COMAR [$5,000 average gross daily charter hire rate x 100 days x .05 (50% of 10%) = $25,000].

Under these provisions, the termination fee was $537,246.86. There is no evidence that the $537,246.86 amount calculated under the termination provisions approximated the actual loss that resulted from the Owners' early termination of the agreements.

With regard to whether the termination provisions approximated the loss anticipated at the time the contracts were executed, Comar argues that the formula was reasonable because the cyclical nature of the charter market makes it difficult to anticipate actual losses and the 50% discount figure is a reasonable approximation of the vessels' utilization rate. The district court found that the formula does not account for either previous or future nonworking days. The average gross daily charter-hire rate is calculated based only on the days the vessels worked, and that daily rate is multiplied by the number of days until the agreements' expiration.

Comar contends, however, that the 50% discount serves to neutralize the inflation by anticipating that the vessels will only be used on 50% of the remaining days.  This discount appears reasonable considering the vessels' yearly average utilization rates varied from 35% to 98% in the years preceding termination.  Nonetheless, even assuming the 50% discount is a reasonable anticipation of what Comar's management fee would have been but for termination, we cannot conclude that the district court erred in holding that the termination fee is penal.  As the district court noted, Charles Tizzard, Comar's president, and others testified that Comar incurs general and administrative expenses in its management of the vessels, and that most of the management fee it received paid those expenses and included only a small amount as profit.  Tizzard testified that those expenses would decrease, but would not be eliminated, if the contracts were terminated.  The termination fee formula, however, makes no deductions to account for the fact that Comar would have fewer expenses in the event of termination, and Comar has not quantified the expenses that would remain.  We cannot say that the district court clearly erred in finding that the termination provisions do not provide a reasonable approximation of the loss anticipated at the time the contracts were formed.

Moreover, as the district court noted, the fact that breach of one agreement constitutes a breach of the other three agreements underscores the penal nature of the termination fee.  Additionally, the termination fee is operative not only in the event the Owners terminate but also if the Owners sell the vessels and Comar "elects not to manage the Vessel[s] for a new owner." Comar does not, and reasonably could not, assert that the termination formula approximates the damages it would suffer in the event the Owners sell the vessels to a new owner willing to assume the Owners' obligations.  Nor did the

agreements include a corresponding remedy for the Owners in the event of Comar's breach.

Accordingly, the district court did not commit reversible error in concluding that the termination-fee provision is unenforceable.

**B**

In lieu of the termination fees, the district court awarded Comar "$3,000 per calendar month, for each vessel, from the date of termination of the Agreements, August 14, 2009, through the end date of the Agreements, January 31, 2010," based on the agreements' default management fee and offset by what Comar owed the Owners after collecting the outstanding accounts receivable. The Owners challenge the award of $3,000 per month per vessel, contending it is clearly erroneous.

"A district court's damages award is a finding of fact, which this court reviews for clear error."[23] "If the award of damages is plausible in light of the record, a reviewing court should not reverse the award even if it might have come to a different conclusion."[24]

The district court found that the "[a]greements' default monthly management fee [of $3,000] . . . fixe[d] any uncertainty or difficulty otherwise involved in determining losses for non-working months . . . and provide[d] a ceiling for determining any alleged losses." The Owners argue that awarding the minimum payment specified in the agreements of $3,000 per month conflicts with the district court's finding that more than half of Comar's revenue from management fees went to general and administrative expenses and that the Owners' termination relieved Comar of paying at least some of

---

[23] *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006) (per curiam).

[24] *St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 410 (5th Cir. 2000).

those expenses. But there is no indication that Comar would have only earned the $3,000 minimum under the agreements. Comar often earned management fees in excess of the minimum. The average monthly management fees in 2009 were $4,007 for the Conqueror, $5,789 for the Enforcer, $6,222 for the Marauder, and $5,615 for the Raider. In 2008, the average monthly management fees were even higher: $9,547 for the Conqueror, $10,532 for the Enforcer, $10,515 for the Marauder, and $9,481 for the Raider. The district court's award is "plausible in light of the record" and not clearly erroneous.[25]

## C

Comar challenges the district court's holding that it wrongfully arrested the vessels after the Owners' termination. To recover for wrongful arrest of a vessel, there must be (1) no bona fide claim of a maritime lien on the vessel[26] and 2) a showing of "bad faith, malice, or gross negligence [on the part] of the offending party."[27]

---

[25] *Id.*

[26] *See Arochem Corp. v. Wilomi, Inc.*, 962 F.2d 496, 500 (5th Cir. 1992) ("The district court correctly granted Wilomi's motion for summary judgment against Arochem's wrongful arrest claim because Wilomi acted neither in bad faith, nor with malice or gross negligence. A company does *not* wrongfully arrest cargo *by asserting a bona fide lien* to protect its interest." (emphases added)); *Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 475 (5th Cir. 1984) (holding that because "there was a bona fide dispute over the validity of [the] lien" and "no evidence of . . . bad faith," this court would not award attorney's fees); *see also TTT Stevedores of Tex., Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1141 (5th Cir. 1983) ("Because we have held that TTT Stevedores had a good lien, we find Dempo entitled to no damages for wrongful seizure.").

[27] *Arochem Corp.*, 962 F.2d at 499 (quoting *Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937)).

Whether a maritime lien exists is a question of law,[28] reviewed de novo.[29] A finding of joint venture precluding such a lien is reviewed for clear error.[30] "The district court's determination . . . [of] bad faith . . . was a conclusion of fact, which we review under the deferential clear error standard."[31] The burden of proof lies with the party alleging wrongful arrest.[32] "[T]he advice of competent counsel, honestly sought and acted upon in good faith is alone a complete defense" to a claim of damages for wrongful arrest.[33]

Comar contends that it seized the vessels pursuant to valid maritime liens because, at the time of termination, the Owners owed it funds for necessaries. The district court found that the only amounts owed to Comar by the Owners as of the date of the arrest of the vessels was for the termination fees specified in the agreements, and that the termination fees were not for

---

[28] *See E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia*, 876 F.2d 1168, 1171, 1173-74 (5th Cir. 1989) (stating that all issues presented in the case were questions of law, and existence of a maritime lien was one of the issues).

[29] *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013); *Theriot v. United States*, 245 F.3d 388, 394 (5th Cir. 1998) (per curiam) ("In an admiralty action tried by the court without a jury, . . . [q]uestions of law are reviewed de novo.").

[30] *See Crustacean Transp. Corp. v. Atalanta Trading Corp.*, 369 F.2d 656, 660 (5th Cir. 1966) (holding that a finding of no waiver of the maritime lien—and thus a finding of no joint venture—"cannot be disturbed unless clearly erroneous"); *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 211 (11th Cir. 1991) ("We review the district court's findings as to a joint venture's existence under the clearly erroneous standard.") (citing *Crustacean Transp. Corp.*, 369 F.2d at 660).

[31] *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 300 (5th Cir. 2009).

[32] *See Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, 474 (5th Cir. 1984) ("In order to collect [attorney's] fees, the plaintiff must prove that the party seizing the vessel acted in bad faith, with malice, or with wanton disregard for the rights of his opponent."); *Furness Withy (Chartering), Inc., Panama v. World Energy Systems Assocs.*, 854 F.2d 410, 411 (11th Cir. 1988) ("It is an established principle of maritime law that one who suffers a wrongful attachment may recover damages from the party who obtained the attachment, provided he prove that such party acted in bad faith.").

[33] *Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir. 1937); *accord Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (citing *Frontera Fruit Co.*, 91 F.2d at 297).

any services that Comar actually rendered to the vessels. As of the date of the arrest, if Comar had collected and applied all outstanding accounts receivable from the operation of the vessels to the Owners' accounts payable, without considering the termination fees, Comar would have owed the Owners more than $21,000. The district court had previously held that the management agreements could not give rise to liabilities that would create maritime liens. We agree with the district court that Comar wrongly arrested the vessels.

We review the district court's finding of bad faith for clear error. Before the vessels were arrested, the Owners notified Glynn Haines, CEO of Comar, that they intended to terminate the agreements effective immediately because they had signed management agreements with another organization. Four days after the Owners terminated the agreements, Comar secured the arrest of the vessels. Comar argues that it was acting in good faith pursuant to legal advice that the outstanding expenses and accounts-receivable loans gave rise to maritime liens.

Due to conflicts in testimony, the district court found that neither Haines nor Tizzard were credible witnesses regarding Comar's arrest of the vessels. Haines provided inconsistent testimony regarding the extent to which Haines discussed the decision to arrest the vessels with counsel. Tizzard was impeached on cross-examination and the district judge's questions regarding his role in the preparation of the damages claimed in Comar's original complaint and regarding the certainty of collecting the outstanding accounts receivable at the time of the arrests. Haines testified that the decision to arrest was made knowing that there were outstanding accounts receivable. Haines also stated that he had worked with the companies who owed these accounts and had had no difficulty collecting outstanding accounts receivable in the past. As noted above, other than the unenforceable termination fees, assuming Comar collected all accounts receivable, Comar owed the Owners over $21,000.

17

Haines testified that even if he had known that Comar owed the Owners, he still would have arrested the vessels because he did not know what legal options he had to freeze the vessels' accounts.

The district court found that, "at the time of arrest, because Comar knew (through Haines and Tizzard) . . . that Comar would ultimately owe the [Owners] money, Comar lacked probable cause to arrest the Vessels." The district court also found that although Comar had access to all relevant information, it acted before it made a complete assessment of who owed what and did not provide its legal counsel complete information.  Furthermore, the district court noted that Comar amended the arrest complaint to include a claim for failure to repaint the vessels "even[] though the Vessels were at a shipyard being painted when [Haines] had them arrested."  Under these circumstances, the district court did not clearly err in finding that Comar acted in bad faith when arresting the vessels and did not rely on legal advice in good faith.

**D**

The Owners assert that the court erred in declining to award them lost-profit and lost-equity damages arising from Comar's wrongful arrest of the vessels.  "Determinations of the trial court concerning the amount of damages are factual findings, and we will set them aside only if clearly erroneous."[34]

As to lost profits, a court may only award damages for detention of a vessel "when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable

---

[34] *Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1140 (5th Cir. 1994); *accord In re M/V Nicole Trahan*, 10 F.3d 1190, 1193-94 (5th Cir. 1994).

certainty."[35]   In relation to detention damages following a "collision or other maritime tort," the Supreme Court has stated:

> The best evidence of damage suffered by detention is the sum for which vessels of the same size and class can be chartered in the market. . . .   In the absence of such market value, the value of her use to her owner in the business in which she was engaged at the time of the collision is a proper basis for estimating damages for detention, and the books of the owner, showing her earnings about the time of her collision, are competent evidence of her probable earnings during the time of her detention.[36]

Similarly, this court has stated detention damages "need not be proven with an exact degree of specificity"[37] nor with evidence of "a specific lost opportunity."[38]   Rather, "the time honored rule in maritime cases . . . is to seek a fair average based on a number of voyages before and after"[39] then deduct the costs avoided by the detention.[40]

The district court did not clearly err in concluding that the Owners had failed to introduce evidence to allow it to determine lost-profit damages with

---

[35] *The Conqueror*, 166 U.S. 110, 125, 127 (1897); *see also Marine Transp.*, 37 F.3d at 1140 ("A district court's lost profits methodology must permit it to arrive at a damages amount 'with reasonable certainty.  No more is required.'" (quoting *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1155 (5th Cir. 1990)) (some internal quotation marks omitted)); *M/V Nicole Trahan*, 10 F.3d at 1194.

[36] *The Conqueror*, 166 U.S. at 127; *see Cardinal Shipping*, 744 F.2d at 474 (referring to wrongful seizure of a vessel as a tort).

[37] *Marine Transp.*, 37 F.3d at 1140 (quoting *Mitsui O.S.K. Lines, K.K. v. Horton & Horton, Inc.*, 480 F.2d 1104, 1106 (5th Cir. 1973)).

[38] *Id.* at 1141 n.3; *accord M/V Nicole Trahan*, 10 F.3d at 1194-96.

[39] *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1001 (5th Cir. 1984); *accord M/V Nicole Trahan*, 10 F.3d at 1194-96 (applying the *Avondale* rule to a 6.6-day detention for repairs following a collision).

[40] *Marine Transp.*, 37 F.3d at 1150 ("The damage that this loss represents is the ship's charter rate, less the variable or incremental expenses that would have been required of the owner to perform the charters, discounted by the probable utilization rate." (quoting *Kim Crest, S.A. v. M.V. Sverdlovsk*, 753 F.Supp. 642, 649 (S.D. Tex. 1990)).

reasonable certainty.[41]   Lirette and St. Amand testified that Kilgore Marine contacted them regarding use of the vessels before and during the arrest of the vessels; however, there is no other evidence documenting this work.   Lirette also testified that Kilgore Marine was "ready to put [one of the vessels] to work" after the wrongful arrest, at least one of the vessels was at work shortly after its release and repainting, and "Kilgore Marine ended up working the boats for most of what they've worked on since then until today."   However, the Owners do not provide any indication of when all of the vessels were put back to work, the frequency of the work, or the profits from that work.   Although the vessels operated at a profit in June 2009 (two months before the arrest of the vessels), the vessels, as a whole, operated at a loss the prior five months.   Accordingly, the evidence does not leave us with a "definite and firm conviction that a mistake has been committed" by the district court.[42]

Regarding lost-equity damages, the Owners argue that when Comar seized the vessels, the Owners could not pay bond on three of them because they did not have sufficient funds and JPMorgan would not provide a loan. The Owners assert that Comar's wrongful arrest forced them to file for bankruptcy.   The three entities that owned the vessels did file voluntary petitions for bankruptcy on September 21, 2009, approximately three days before the vessels were released from arrest.   However, the vessels were not sold until nearly four years later, after the bankruptcies had been converted from Chapter 11 reorganizations to Chapter 7 liquidations because the Owners failed to make required payments to JPMorgan.   Comar disputes that the arrests caused the Owners to lose equity in its vessels during liquidation, citing, among other reasons, JPMorgan's refusal to lend the Owners money to

---

[41] *Id.* at 1140.

[42] *Id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

pay the vessels' bonds, the Owners' business decisions, the poor market environment, and the Owners' failure to comply with the reorganization plans. The district court did not clearly err in denying such damages, even assuming lost-equity damages were available in the maritime context, which is a question we need not resolve.

**E**

The Owners contest the district court's holding that Lirette and St. Amand personally guaranteed the agreements. "The district court's interpretation of a contract is reviewed de novo, and [t]he contract and record are reviewed independently and under the same standards that guided the district court."[43]   "[I]f the interpretation of the contract turns on the consideration of extrinsic evidence, such as evidence of the intent of the parties," we review for clear error.[44]

The parties agree that Louisiana law applies to the guaranty provision, and the district court applied Louisiana law to this issue. We assume that Louisiana law governs for purposes of this appeal.[45]  Under Louisiana law, a guaranty "must be expressed clearly and must be construed within the limits

---

[43] *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 439 (5th Cir. 2002) (alteration in original) (quoting *St. Martin v. Mobil Exploration & Producing U.S. Inc.*, 224 F.3d 402, 409 (5th Cir. 2000)) (internal quotation marks omitted).

[44] *Id.* (quoting *Nat'l Union Fire Ins. Co. v. Circle, Inc.*, 915 F.2d 986, 989 (5th Cir. 1990) (per curiam)).

[45] *See Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961) (stating "an agreement to pay damages for another's breach of a maritime charter is not" governed by admiralty law); *Angelina Cas. Co. v. Exxon Corp., U.S.A.*, 876 F.2d 40, 41 (5th Cir. 1989) ("Under the rule in *Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 955 (5th Cir. 1988), state law governs disputes arising out of the performance of a separate non-maritime obligation of a mixed contract."); *cf. United States v. Little Joe Trawlers, Inc.*, 776 F.2d 1249, 1251 n.2 (5th Cir. 1985) ("[T]he parties have briefed and argued Texas law throughout this litigation, and the trial court applied Texas law.  Therefore, we will refrain from changing the rules in the middle of the game, and in doing so, we apply Texas law.").

intended by the parties to the agreement."[46]  However, "[c]ontracts of guaranty . . . are subject to the same rules of interpretation as contracts in general."[47] Accordingly, "[c]ourts are bound to give legal effect to all such contracts according to the true intent of the parties, and this intent is to be determined by the words of the contract when these are clear and explicit and lead to no absurd consequences."[48]

The Owners acknowledge that the agreements contain a guaranty provision providing that "[t]he principal of the Owner, whose name is set forth below, hereby unconditionally guarantees the prompt and full payment of all obligations owed by Owner under this Agreement."  They further concede that St. Amand and Lirette signed their names under the heading "GUARANTORS OF THIS AGREEMENT" and that, beneath their signatures appears the following language: "Tracy P. Lirette, Guarantor" and "Chris St. Amand, Guarantor."  They assert, however, that the district court erred in concluding that they personally guaranteed the agreements because Lirette and St. Amand are not the "principal[s] of the [vessel] Owners."  Rather, the principal of the vessel-owning LLCs is Gator Offshore, LLC (Gator).  The guaranty provision and signature page appear as follows:

---

[46] *Regions Bank v. La. Pipe & Steel Fabricators, LLC*, 2011-0839, p. 4 (La. App. 1 Cir. 12/21/11); 80 So. 3d 1209, 1212; *see also* LA. CIV. CODE ANN. art. 3038 ("Suretyship must be express and in writing."); *Wooley v. Lucksinger*, 2006-1140, p. 7 (La. App. 1 Cir. 12/30/08); 7 So. 3d 660, 664 (citing LA. REV. STAT. ANN. § 10:1-201(b)(39)); LA. REV. STAT. ANN. § 10:1-201(b)(39) ("'Surety' includes a guarantor or other secondary obligor.").

[47] *Ferrell v. S. Cent. Bell Tel. Co.*, 403 So. 2d 698, 700 (La. 1981) (citing *Am. Bank & Trust Co. v. Blue Bird Rest. & Lounge, Inc.*, 279 So. 2d 720 (La. App. 1 Cir. 1973)).

[48] *Id.* (citing LA. CIV. CODE ANN. art. 1945).

No. 13-30156 c/w 13-30819

ARTICLE 20.  **PRINCIPAL OF OWNER GUARANTY**.  The principal of the Owner, whose name is set forth below, hereby unconditionally guarantees the prompt and full payment of all obligations owed by Owner under this Agreement, including, without limitation, all Owner Expenses, the Management Fee and all other obligations owed by Owner (including the surviving indemnity obligations) owed under this Agreement.

*[Signature page follows]*

Executed in multiple originals, this __21__ day of __May__ 20__08__.

WITNESSES:

_Wendy Ruf_

NAUTICAL OFFSHORE
CORPORATION, a/k/a COMAR

By: _____
Name:  Charles B. Tizzard
Its:  President

WITNESSES:

MARAUDER MARINE LOGISTICS, LLC,
OWNER

By:  Gator Offshore, LLC, its Sole Member

By: _____
Name:  Tracy P. Lirette
Its:    Member

WITNESSES:

GUARANTORS OF THIS AGREEMENT:

By: _____
Tracy P. Lirette, Guarantor

By: _____
Chris St. Amand, Guarantor

The district court determined that the agreements clearly indicated that Lirette and St. Amand signed in their individual capacity as personal guarantors.  If the guaranty provision refers to Gator ("[t]he principal of the Owner"), as the Owners argue, there would be no need for Lirette and St. Amand to sign again as "Guarantors of this Agreement."  The contract is unambiguous that Gator's signature, through Lirette, indicates its consent to the terms of the contract, including the guaranty provision, while Lirette and St. Amand's signatures are separate, personal guarantees.

Even if the agreements were ambiguous, the district court found Lirette and St. Amand's testimony that they did not believe they were personally

guaranteeing the agreements to be incredible, and we see no clear error in the district court's findings as to their intent.[49]

### F

"As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled."[50]  The district court has discretion to deny prejudgment interest "only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest."[51]  "Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff."[52]

The district court denied Comar and the Owners prejudgment interest because of the "'peculiar circumstances' of this action."  But it did not set forth what those peculiar circumstances were, contrary to what we have stated is the best practice for a district court denying prejudgment interest.[53]  Nonetheless, we may still affirm the denial of prejudgment interest unless the record indicates the district court clearly erred when it found peculiar

---

[49] *See In re Liljeberg Enters., Inc.*, 304 F.3d 410, 439 (5th Cir. 2002).

[50] *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. Unit A 1980).

[51] *Id.*

[52] *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986); *see also City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195-98 (1995).

[53] *Cantieri Navali Riuniti v. M/V Skyptron*, 802 F.2d 160, 165 n.9 (5th Cir. 1986) ("[T]he best practice for a trial court that refuses to award prejudgment interest would be for it to detail the peculiar circumstances it has found . . . ." (quoting *Noritake*, 627 F.2d at 729 n.4) (internal quotation marks omitted)).

No. 13-30156 c/w 13-30819

circumstances existed.[54]　　For both Comar and the Owners, the awarded damages are substantially less than originally claimed.[55]　　Because the record reveals a peculiar circumstance on which the district court could have reasonably based its denial of prejudgment interest, the district court did not clearly err in denying prejudgment interest to Comar and the Owners.[56]

\*　　　\*　　　\*

For the above reasons, we AFFIRM the district court's judgment.

---

[54] *Noritake*, 627 F.2d at 729 ("If the trial court explicitly denies prejudgment interest (rather than merely omitting any reference to it), then this is based on a factfinding that peculiar circumstances exist; the factfinding is sometimes explicitly set out, with the peculiar circumstances detailed in the court's findings of fact and conclusions of law, or it may be implicit in the denial of prejudgment interest without a listing of the circumstances. If the trial court was not clearly erroneous in finding that peculiar circumstances exist, then its denial of prejudgment interest was discretionary." (footnote omitted)); *see also In re Signal Int'l, LLC*, 579 F.3d 478, 501 (5th Cir. 2009) ("[T]he district court omitted any reference to prejudgment interest. Thus, under the framework established in *Noritake*, we analyze the record to determine if the existence of a peculiar circumstance was clear.").

[55] *See Reeled Tubing*, 794 F.2d at 1028 ("Peculiar circumstances may be found . . . where the damages award was substantially less than the amount claimed by plaintiff.").

[56] *See Noritake*, 627 F.2d at 729; *see also In re Signal Int'l*, 579 F.3d at 501.